# STATE OF CONNECTICUT *v.* NISSA APONTE
## (SC 16028)

Callahan, C. J., and Norcott, Katz, Palmer and McDonald, Js.

Argued April 23—officially released July 27, 1999

*Lori Welch-Rubin,* special public defender, for the appellant (defendant).

*Michele C. Lukban,* assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict,* state's attorney, and *Joseph J. Harry,* assistant state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The defendant, Nissa Aponte, appealed to the Appellate Court from the judgment of conviction, following a jury trial, of two counts of assault in the first degree in violation of General Statutes § 53a-59 (a) (1)[1] and two counts of risk of injury to a child in violation of General Statutes § 53-21.[2] Following the decision of the Appellate Court affirming the judgment of conviction; *State* v. *Aponte,* 50 Conn. App. 114, 718 A.2d 36 (1998); the defendant successfully sought certification on two of the issues decided by that court.[3] *State* v.

[1] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument. . . ."

While changes have been made to § 53a-59 (a) since 1994, the time of the underlying crimes in the present case, subdivision (1) has remained unchanged. References herein are to the current revision.

[2] General Statutes § 53-21 provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony."

Since 1994, there have been changes made to § 53-21. The changes to this quoted portion of the statute, however, were technical only. In the interest of clarity, therefore, references herein are to the current revision.

[3] In her appeal to the Appellate Court, the defendant claimed that the trial court improperly "(1) instructed the jury on accessorial culpability, (2) denied her motion for acquittal and deemed the injuries inflicted comported with § 53a-59 (a) (1), (3) admitted evidence of prior custodial disputes, (4) admitted incomprehensible testimony by the victim, (5) condoned prosecutorial misconduct in which the state gave the victim a doll prior to her testifying, (6) permitted evidence of criminal convictions to impeach the defendant's only witness, (7) instructed the jury as to the victim's testimony,

*Aponte*, 247 Conn. 926, 719 A.2d 1169 (1998). We conclude that the actions of the prosecutor in giving the victim a Barney[4] doll prior to her testifying, along with the trial court's limitations on the defendant's ability to expose to the jury the impact that such conduct may have had on her testimony, harmfully deprived the defendant of due process[5] in connection with one of the assault convictions.

The Appellate Court set forth the following procedural history and relevant facts. "The defendant and Carmen Lopez Casado were both charged with two counts of assault in the first degree and two counts of risk of injury to a child involving the defendant's three year old daughter [victim]. The cases were consolidated for trial and, after the jury was selected, the state moved for and the trial court granted severance of the two cases. The state elected to proceed against the defendant first. The defendant moved for dismissal of the jury based on the questioning of prospective jurors concerning their opinions on the defendant's sexual orientation. The motion was denied.

---

(8) failed to grant a mistrial at the conclusion of voir dire, and (9) failed to grant the defendant's motion to dismiss one count of risk of injury to a child because of duplication." *State* v. *Aponte*, supra, 50 Conn. App. 116.

The defendant thereafter sought certification on four of those claims. Specifically, she sought to challenge the Appellate Court's decision regarding claims (2), (3), (4) and (5). We granted the defendant's petition limited to the following two issues: (1) "Did the Appellate Court properly conclude that the actions of the prosecutor did not result in a denial of due process?"; and (2) "Did the Appellate Court properly conclude that the trial court did not abuse its discretion in admitting the victim's testimony?" *State* v. *Aponte*, 247 Conn. 926, 719 A.2d 1169 (1998).

[4] Barney is the name of a purple dinosaur on an educational children's television show.

[5] The defendant cites to article first, § 8, of the constitution of Connecticut, which provides in relevant part: "No person shall be . . . deprived of . . . liberty . . . without due process of law . . . ." Although she relies on the state constitution, she does not make an argument that the state constitution affords greater rights than its federal counterpart.

"The trial court denied the defendant's request to conduct a hearing into the competency of the [victim]. It also denied a motion for mistrial that was based on the prosecution's giving the victim a doll prior to her testifying. The trial court also denied the defendant's motion to strike the victim's testimony as being incomprehensible.

"The jury reasonably could have found the following facts. The defendant is the mother of the victim, who was born on April 7, 1990. At the time the victim was one and one-half years old, the defendant requested that her friend Ermys Lugo raise her. In February, 1994, Lugo turned the [victim] over to the defendant pursuant to a court order. The child was physically sound at that time.

"On March 30, 1994, the defendant arrived at the home of her mother, Irma Ramos, with [the victim], whose eyes were black and swollen. The defendant explained that the [victim] had struck the inside of the car. The defendant left the [victim] with Ramos after being assured that the latter would not notify the police. Ramos noticed marks on the victim's back, front and legs when giving her a bath. Ramos secreted the child with a neighbor to hide her from the defendant. The neighbor called the Bridgeport police on March 31, 1994. The [victim] was taken by ambulance to Bridgeport Hospital where she remained for a few days. She told Ramos that both the defendant and Lopez Casado had hurt her.

"Officer David Osika of the Bridgeport police department responded to the neighbor's call and inquired about who had injured the victim. The victim indicated that her mother, the defendant, had done it. Detective Michael Whittaker of the Bridgeport police youth bureau also responded to the neighbor's home and asked the victim how she was injured. The victim said

'la pata,' Spanish slang for lesbian. Whittaker interviewed the defendant, who implicated Lopez Casado as having harmed the victim.[6] He took another statement from the victim that both the defendant and Lopez Casado had hit her using a belt and that Lopez Casado inflicted abrasions to her knees and burned her finger.

"The emergency room physicians discovered, in addition to the eye injury, that there were numerous marks on the victim's arms, thighs, knees, lower legs, chest, abdomen, back, ear and behind the ear. Nada Abdel A'al, an emergency room pediatric resident, examined the victim and diagnosed a pancreatic injury, which proved not to be life threatening. She determined that the eye injury was serious and that the victim could not open her left eye.

"Richard Garvey, a general surgeon, testified that laboratory test results indicated possible internal bleeding consistent with an injury to the pancreas, making death a possibility. His overall diagnosis was 'battered child syndrome.' This diagnosis was confirmed by Alison Driggers, a pediatrician, who also determined that the pancreatic injury created a risk of death.

"The defendant's only witness was Carmen Lopez, Lopez Casado's mother, who testified that on March 30, 1994, the victim was on the middle rear seat of her car as Lopez exited from her driveway. A truck caused her to apply the brakes suddenly causing the victim to fall forward between the front bucket seats." *State* v. *Aponte*, supra, 50 Conn. App. 117–18. Additional facts will be set forth as necessary.

---

[6] In his interview with the defendant, Whittaker learned that the defendant had "smacked" the victim while she was driving the car because the victim was in the back seat acting "crazy." The defendant related how she had told the victim to stop but when she did not respond, the defendant admitted that she hit the victim. Ramos testified that the defendant had told her that while they were in the car, the defendant had been about to reprimand the victim when the victim's eye struck a car part.

## I

Prior to the victim being called as a witness, both parties and the court agreed that in order to make her more comfortable, Ramos would be seated next to the victim throughout her testimony. Additionally, unaware of its origin at that time, the defendant had no objection to "the purple item" (Barney) that the victim appeared to be holding.

A few weeks prior to trial, the state's attorney had consulted with the defendant and Lopez Casado about making a gift of a stuffed animal to the victim from the court and all parties. Both the defendant and Lopez Casado indicated the impropriety of such action and assumed the matter was concluded.

During cross-examination, the defendant elicited testimony that prior to the victim testifying, the state's attorney had given the victim a Barney doll, which she had clutched throughout her direct examination. The defendant then attempted to determine whether the state had given her the doll prior to showing her the photographs of her injuries. Specifically, the defendant asked the victim whether she had had Barney with her when she viewed the photographs. When the victim failed to respond, the defendant questioned her about whether the state's attorney had given her a ride on the rolling chair in which she was seated. When the state objected, the court excused the jury and the following colloquy occurred.

"[John Forbes, Assistant Public Defender]: If your Honor please, the question of what [Joseph J. Harry, assistant state's attorney] has done with a witness is certainly relevant to show bias, prejudice, motive, any of a number of factors authorized by our court. I'm going to move, I think, at some point to strike all of the [victim's] testimony. It's like bribery. Why didn't he let me give her an animal.

"The Court: Why didn't you?

"Mr. Forbes: Because I think that's improper, Your Honor. I think it's unethical, and I think it may have consequences, and I'm going to look into it. But, I just think that conduct is reprehensible on a [victim] who, by statute, is allowed to testify, who I still am going to move at the end that the testimony be stricken because it's not making any sense at all. But to then cajole and give gifts to this [victim] is outrageous. I can put on witnesses who saw Mr. Harry roll [the victim] down—up an down the hallway like it was an amusement park in the same chair that she's sitting on.

"And I think the jury's entitled to hear that with regard to what this [victim] is saying, the fresh age of the [victim], the absorption of [her] mind to be receptive to any suggestion or question or response that would please someone who gives her gifts. I just think it's outrageous. And I claim the question.

"The Court: What relevance does it have, sir?

"Mr. Forbes: Again, it goes to a motive or bias or prejudice for testifying. She thinks the prosecutor is the greatest thing since cream cheese. . . .

"Mr. Harry: Your Honor, I think what he stated is contemptible. I would ask for sanctions. He makes blanket statements, doesn't know what he's talking about. The court had ordered—asked, not ordered, but asked that I make the [victim] more comfortable. Regardless of whether the court had done so or not, the research I have done, the seminars I have been to, I have the youngest victim so far in Connecticut that I know of testifying on the stand, Your Honor. I have to make her more comfortable. Those pictures show she went through all kinds of hell and I [have] got to make sure that she is comfortable.

"I told the court and I told Mr. Forbes, the one thing she was afraid of coming into this court is you, Your Honor, taking her away from . . . Miss Ramos there. That's the one thing. I got her in here. She's testified. She hasn't testified to anything inconsistent to what Miss Lugo or Miss Ramos had testified. Your Honor, if he wants to bring charges that I tried to influence a witness, let him do so and let him do so on paper so I can answer that.

"Right now, Your Honor, he's asked questions that are very ambiguous, yes, she did have Barney when I showed her the pictures in court on Friday. She cannot distinguish the times like you, I, and Mr. Forbes. He's asking these ambiguous questions trying to either cause a mistrial or to have her testimony stricken from the record. He has shown nothing, absolutely nothing to show that [the victim] was influenced by what I did. I made her more comfortable where she walks into this courtroom, she sees me and she knows she's going home with Miss Ramos and that I will not take her away from Miss Ramos, that she feels more comfortable. That's the sole thing that I would do for any witness, a sexual assault witness, any witness, I would make more comfortable in this court. And if he thinks that giving a Barney to a five year old is bribery, let him bring me up on charges, Your Honor, or hold me in contempt or sanctions that I tried to influence this trial. Other than that, I want either his allegations on paper or that the judge, or Your Honor, tell him to keep his mouth shut in regard to these frivolous allegations.

"The Court: All right. Mr. Forbes, anything else from you, sir? . . .

"Mr. Forbes: Since Mr. Harry had brought it up, approximately three to four weeks ago, he had talked about possibly getting a stuffed animal for the witness. And the conversation came up and that he was going

to indicate that it was from himself, the court, myself and [Timothy Aspinwall, special public defender]. And I can produce Mr. Aspinwall or the court can put him on as an officer of the court to testify. We laughed at it and said that's silly, he can't do that. Not only does he not attempt to do that, he then himself makes a gift. And I just think that's—

"Mr. Harry: Well—

"Mr. Forbes: It's grounds for a mistrial, Your Honor, and I would so move, respectfully.

"Mr. Harry: Your Honor, that in and of itself shows Mr. Forbes that I attempted to make sure there was no type of impropriety by showing that it wasn't from one individual, it was from everybody to make her feel more comfortable. Your Honor, I didn't bring in toys because I didn't want to assume—giving her a toy and then having to take it away from her. And I did not buy that, it was bought with state funds.

"The Court: Mr. Forbes . . . I will allow you, however, because I believe it would be appropriate to get a response since it's already—the question [has] already been posed. I think the ladies and gentlemen of the jury want to know, but I'm very satisfied that the conduct of the state's attorney in making the [victim] comfortable was strictly for that purpose. I don't believe under any circumstances that a three and one-half year old child is going to be influenced by—by conduct of riding her around in a chair, bringing her into the court, and giving her a toy. So that, I will allow the question. As far as relevancy goes, Mr. Harry, I will overrule it, and I direct you, Mr. Forbes, to examine this witness concerning the injuries once you've elicited a response on the business of riding her around on that chair in this court. Do you understand?

"Mr. Forbes: The Court is—

"The Court: Directing you to examine her with regards to the injuries.

"Mr. Forbes: I have some inquiries still regarding her ability to testify, Your Honor, and the court is prohibiting me from asking those questions?

"The Court: I will—if you want to ask her about her ability to testify, I'll allow that, but not as it relates to the state's attorney riding her around here in the courtroom on that chair. You'll get your answer and then we'll move along. Okay.

"Mr. Forbes: Just so—that's all the court's asking me not to do, is to not refer to the chair again after that answer?

"The Court: Yes. Or any other questioning that's going to suggest any improper conduct by the state's attorney with this [victim] in a form of a bribery as I think you put it in your argument to the court. All right. Anything else?

"Mr. Forbes: The court's denying my motion for mistrial based on his conduct?

"The Court: Yes. I am.

"Mr. Forbes: May I have an exception, please?

"The Court: All right. Sheriff, if you please."

Thereafter, in the presence of the jury, the defendant asked that the last question, which pertained to whether the state's attorney had given the victim a ride in the rolling chair, be read back and that the victim be directed to answer it. The record reflects that she answered in the affirmative.

The defendant acknowledges that it would have been proper to allow the victim to bring a doll from home to hold as a comfort object during her testimony. See, e.g., *State* v. *Palabay*, 9 Haw. App. 414, 417, 844 P.2d 1 (1992). "Many children derive comfort from a favorite

toy or stuffed animal. A child witness should be permitted to bring their particular favorite object with them. These comforting objects are more than mere toys. They symbolically represent a little bit of a mother's ability to soothe the child when frightened or nervous. Their presence helps children calm themselves when parents are not immediately on hand." (Internal quotation marks omitted). J. Myers, K. Saywitz & G. Goodman, "Psychological Research on Children as Witnesses: Practical Implications for Forensic Interviews and Courtroom Testimony," 28 Pac. L.J. 3, 71 (1996). Therefore, had the victim simply brought a favorite object from home, there would have been no basis for objection.

The defendant's complaint at trial and on appeal is that giving the Barney doll to the victim prior to her testifying constitutes prejudicial misconduct that jeopardized the defendant's right to a fair trial. She further claims that the trial court's failure to appreciate the ramifications of such conduct as it might impact the victim's suggestibility, as evidenced by its restrictions on her ability to cross-examine the victim, necessitates that she be given a new trial. We agree with the defendant that the state's attorney's misconduct, compounded by the trial court's response, violated her due process rights. We further conclude, however, that in light of the totality of evidence in the case, this impropriety was harmful only in connection with the assault charge relating to the pancreatic injury.

A

"It is well recognized that the state's attorney is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the State, who seek impartial justice for the guilty as much as for the innocent. In discharging his most important duties, he deserves and receives in peculiar

degree the support of the court and the respect of the citizens of the county. By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused be guilty, he should none the less be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe." (Internal quotation marks omitted.) *State* v. *Satchwell*, 244 Conn. 547, 577, 710 A.2d 1348 (1998) (*Katz, J.*, concurring).

In analyzing the defendant's claim, the issue is whether the prosecutor's conduct " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden* v. *Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986), quoting *Donnelly* v. *DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974); *State* v. *Hawthorne*, 176 Conn. 367, 372, 407 A.2d 1001 (1978). We do not, however, focus alone on the conduct of the prosecutor. " 'The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct.' " *State* v. *Palmer*, 196 Conn. 157, 163, 491 A.2d 1075 (1985), quoting *State* v. *Ubaldi*, 190 Conn. 559, 562, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983); see *Darden* v. *Wainwright*, supra, 180–81; *State* v. *Doehrer*, 200 Conn. 642, 654, 513 A.2d 58 (1986).

"In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors." *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). Among those

factors we include the extent to which the misconduct was invited by defense conduct or argument; *State* v. *Falcone*, 191 Conn. 12, 23, 463 A.2d 558 (1983); the severity of the misconduct; see *United States* v. *Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981), cert. denied, 456 U.S. 989, 102 S. Ct. 2269, 73 L. Ed. 2d 1284 (1982); the frequency of the misconduct; *State* v. *Couture*, 194 Conn. 530, 563, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985); the centrality of the misconduct to the critical issues in the case; *Hawthorne* v. *United States*, 476 A.2d 164, 172 (D.C. App. 1984); the strength of the curative measures adopted; *United States* v. *Modica*, supra, 1181; *Harris* v. *United States*, 402 F.2d 656, 657 n.1 (D.C. Cir. 1968); *State* v. *Doehrer*, supra, 200 Conn. 654; and the strength of the state's case. See *United States* v. *Modica*, supra, 1181; *State* v. *Couture*, supra, 564; see also *State* v. *Glenn*, 194 Conn. 483, 492, 481 A.2d 741 (1984).

We view the present case against this legal background. The state argues that the state's attorney had not engaged in any misconduct. Its contention is premised essentially on its assertion that the state's attorney did not have an improper motive in giving the victim the doll, but, rather, was simply trying to make the victim feel more comfortable. According to the state, because the trial court, which was in the best position to evaluate the state's attorney's credibility, accepted his representation and concluded that there had been no impropriety, this court should agree with the trial court's finding.

Although the state's attorney had been admonished by the defendant and Lopez Casado that he should not give the victim a gift, the trial court was within its discretion in finding that the state's attorney had not been improperly motivated. The problem with the state's reliance on this character assessment, however, is that "the touchstone of due process analysis in cases

of alleged prosecutorial misconduct [remains] the fairness of the trial, not the culpability of the prosecutor." *Smith* v. *Phillips*, 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982); *State* v. *Cosgrove*, 186 Conn. 476, 488, 442 A.2d 1320 (1982). Indeed, it is "well established that serious prosecutorial misconduct, regardless of the prosecutor's intentions, may so pollute a criminal prosecution as to require a new trial, even without regard to prejudice to the defendant." *State* v. *Hafner*, 168 Conn. 230, 251, 362 A.2d 925, cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74 (1975).

The parties have not pointed to any case in which the state's attorney bestowed a gift upon a witness. Nor has our research revealed any such case, perhaps because the impropriety of such conduct is so obvious.[7] The question, however, is not solely whether the gift in question was improper, but in the present case it is also whether the impropriety was compounded by the trial court's conclusion that there was no basis upon which to question the victim's bias or suggestibility and its ultimate restriction on the defendant's ability to cross-examine the victim to expose her suggestibility.

[7] In *Pryor* v. *State*, 719 S.W.2d 628, 632 (Tex. App. 1986), cert. denied, 485 U.S. 1036, 108 S. Ct. 1599, 99 L. Ed. 2d 913 (1988), following the defendant's conviction of improper sexual contact at his second trial, the defendant claimed that the trial court should have granted him a new trial because the state's investigator had given the child complainant a doll *after* she had testified in his first trial, but before the trial court in that case had granted a mistrial. In *Pryor*, however, at the second trial, the defendant never called the complainant or her mother to testify regarding the gift, nor did he present any evidence that the gift had influenced her testimony. Consequently, despite the conduct, in the absence of harm, the Court of Appeals affirmed the judgment. Id., 632–33.

In another context, in *State* v. *Copeland*, 419 So. 2d 899, 904 (La. 1982), the court, concluding that the defendant's due process rights had been violated as a result of gift giving by the deputy bailiffs to the jurors, reversed a conviction concluding that "[s]uch gift giving has no place in the conduct of a serious criminal case such as this and quite likely did constitute a subtle influence, pro state, the full extent of which is impossible to ascertain."

## B

Our analysis of this aspect of the defendant's claim is guided by the familiar guidelines relevant to cross-examination by the defendant in a criminal trial. "The determination of whether a matter is relevant or collateral, and the scope and extent of cross-examination, generally rests within the sound discretion of the trial court. . . . This discretion arises, however, only after the defendant has been permitted cross-examination and impeachment of a witness sufficient to satisfy the sixth amendment." (Citations omitted.) *State* v. *Colton*, 227 Conn. 231, 248, 630 A.2d 577 (1993), on appeal after remand, 234 Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996).

"It is axiomatic that the defendant is entitled fairly and fully to confront and to cross-examine the witnesses against him. U.S. Const., amends. VI, XIV; Conn. Const., art. I, § 8; *Davis* v. *Alaska*, 415 U.S. 308, 318, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *Chambers* v. *Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); *Pointer* v. *Texas*, 380 U.S. 400, 403–404, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965) . . . . The primary interest secured by confrontation is the right to cross-examination; *Douglas* v. *Alabama*, 380 U.S. 415, 418, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965); and an important function of cross-examination is the exposure of a witness' motivation in testifying. *Greene* v. *McElroy*, 360 U.S. 474, 496, 79 S. Ct. 1400, 3 L. Ed. 2d 1377 (1959). Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. *State* v. *Lubesky*, 195 Conn. 475, 481–82, 488 A.2d 1239 (1985). In order to comport with the constitutional standards embodied in the confrontation clause, the trial court must allow a defendant to expose to the jury facts from which [the] jurors, as the sole triers of fact and credibility, could

appropriately draw inferences relating to the reliability of the witness. *Davis* v. *Alaska*, [supra, 318]; *State* v. *Lubesky*, supra, 482." (Internal quotation marks omitted.) *State* v. *Beliveau*, 237 Conn. 576, 584–85, 678 A.2d 924 (1994).

"The confrontation clause does not, however, suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination. . . . Only relevant evidence may be elicited through cross-examination. . . . The court determines whether the evidence sought on cross-examination is relevant by determining whether that evidence renders the existence of [other facts] either certain or more probable." (Citations omitted; internal quotation marks omitted.) *State* v. *Kelley*, 229 Conn. 557, 562, 643 A.2d 854 (1994).

The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. *State* v. *Barnes*, 232 Conn. 740, 746–47, 657 A.2d 611 (1995); *State* v. *Kelley*, supra, 229 Conn. 563.[8]

Nevertheless, we conclude that the trial court improperly determined that there was no basis upon which to question the victim's bias or suggestibility. Because "[y]oung children are sensitive to the status and power of their interviewers and as a result are

[8] Relevance may be established in one of three ways. First, the proffering party can make an offer of proof. See, e.g., *State* v. *Kulmac*, 230 Conn. 43, 63, 644 A.2d 887 (1994). Second, as in this case, the record can itself be adequate to establish the relevance of the proffered testimony. See, e.g., *State* v. *Santiago*, 224 Conn. 325, 332, 618 A.2d 32 (1992). Finally, the proffering party can establish a proper foundation for the testimony by stating a "good faith basis" that there is an adequate factual basis for his or her inquiry. 1 C. McCormick, Evidence (4th Ed. 1992) § 49, p. 187. "A cross-examiner may inquire into the motivation of a witness if he or she has a good faith belief that a factual predicate for the question exists." *State* v. *Barnes*, supra, 232 Conn. 747.

especially likely to comply with the implicit and explicit agenda of such interviewers . . . [c]hildren . . . are more willing to go along with the wishes of adults and to incorporate adults' beliefs into their reports." S. Ceci & M. Bruck, Jeopardy in the Courtroom: A Scientific Analysis of Children's Testimony, American Psychological Association (1996) p. 152. A critical finding of psychological research is that young children, particularly preschool age children, appear to be more suggestible as a basic psychological characteristic than older children and adults. See S. Ceci, D. Ross & M. Toglia, "Age Differences in Suggestibility: Narrowing the Uncertainties," in Childrens' Eyewitness Memory (1987) p. 82; J. Myers, K. Saywitz & G. Goodman, supra, 28 Pac. L.J. 28.

Many of the questions in the present case were leading or at least assumed a factual foundation,[9] and although the use of such questions with children, when appropriate, does not necessarily render the responses untrustworthy; J. Meyers, Child Witness Law and Practice (1987) § 4.6, pp. 129–34; the specificity inherent in such questions can often have greater potential for

[9] On direct examination, the victim first testified verbally that Lopez Casado, whom she called "Mima," hurt her eye and stomach. Only in response to continued prompting by the state, however, having first given no verbal response at all, did the victim indicate that the defendant also had hit her there. With regard to the burn mark on her left knuckle, the victim again stated first that it was "Mima" and then identified the defendant, whom she called "Nissa," as the responsible person. Only when questioned as to who caused the upper back injury and the mark on her ear, did the victim respond "Nissa." Later, on redirect examination, all of the state's questions were of a compound variety, for example: "[D]id both Nissa and Mima hit you?"; "Did Nissa and Mima hit you in the eye?"; "Did Nissa and Mima both hit you with a belt?"; Did Nissa and Mima . . . hit you on the back with a belt?"; "Did Nissa and Mima hit you in the stomach?" The victim responded by nodding affirmatively. In response to the defendant's questions on recross-examination, however, as to whether "Mima" had hit her on the back with a belt, the victim responded affirmatively. She responded likewise when questioned by the defendant as to whether she had told Whittaker that "Mima" had hit her on the back with a belt.

suggestivity. See *State* v. *Michaels*, 136 N.J. 299, 311–12, 642 A.2d 1372 (1994) (factors that influence child's suggestibility include whether questions asked are leading or nonleading and whether interviewer is trusted authority figure); J. Myers, K. Saywitz & G. Goodman, supra, 28 Pac. L.J. 16 (questions that are suggestive or leading depend on context in which questions asked).

Whether the prior conduct by the state's attorney exacerbated the dangers inherent in such questioning of the victim remains unknown. Although the defendant attempted to highlight the significance of the improper conduct to the trial court, and to expose that conduct to the jury, the court, although properly motivated, failed to appreciate the ramifications of the act as it might have impacted the victim's suggestibility. By precluding the examination of the victim's treatment by the state's attorney, the trial court improperly prohibited inquiry into a legitimate area of cross-examination. "Partiality, or any acts, relationships or motives reasonably likely to produce it, may be proved to impeach credibility." (Internal quotation marks omitted.) *State* v. *Oehman*, 212 Conn. 325, 331, 562 A.2d 493 (1989). Although the defendant elicited a nonverbal response to the one permitted question regarding whether the state's attorney had given the victim a ride in the chair, the defendant was precluded from any further questioning as to when he had given her the doll, specifically whether it was prior to her being shown the photographs of her injuries. More importantly, the defendant was unable to explore the impact of such treatment on the victim's testimony. To prohibit exploration of such treatment unduly restricted the defendant's right to cross-examination. While the victim's prior exchange with the state's attorney might not have been particularly illuminating of motive or bias, the weight to be accorded such evidence was a matter for the jury. Id., 331–32.

## C

We conclude, therefore, that the state engaged in improper conduct and that, rather than taking measures to ameliorate the damage, the trial court compounded the problem by preventing the defendant from exploring the victim's previous contact with the prosecution, thereby failing to allow the defendant a sufficient cross-examination of the victim to satisfy the requirements of the constitution. The totality of these improprieties would, however, require a new trial only if it were not harmless beyond a reasonable doubt. *Chapman* v. *California*, 386 U.S. 18, 23–24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

The correct inquiry for identifying harmless constitutional error is to ask whether, "assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. . . . Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Santiago*, 224 Conn. 325, 333, 618 A.2d 32 (1992).

Upon application of these standards, we are persuaded, from a review of the entire record, that the trial court's limitation of the defendant's cross-examination was harmless beyond a reasonable doubt as to the assault resulting in injury to the victim's eye and as to the two risk of injury charges. The impropriety was not harmless beyond a reasonable doubt, however, as to the assault charge relating to the pancreatic injury.

Although the victim was, without a doubt, a key witness for the prosecution as to which of the two women—the defendant or Lopez Casado—had caused the specific injuries, several other witnesses provided sufficient details in support of all but the assault charge causing the pancreatic injury. Ana D. Maldonado, James Baraja, Whittaker and Osika all testified that the victim had told them that the defendant had hit her. Specifically, Maldonado, the social worker who interviewed the victim at the hospital, related that the victim had told her that the defendant had hit her with a belt.[10] Baraja, the police officer who conducted a field interview of the victim when she was first taken to the hospital, testified that when he asked the victim what had happened to her eye, she responded that the defendant had hit her with a belt. Baraja also testified that when he asked the victim about the mark on her middle finger, she told him that the defendant "had done it with fire."[11] When Whittaker questioned the victim about the injury to her eye, she responded that "Nissa and Mima hit me in the eye." When asked how it happened, she stated that "Mima hit me with a belt and Nissa hit me

[10] Effectively, there was no limitation placed on this testimony. See State v. DePastino, 228 Conn. 552, 565, 638 A.2d 578 (1994) ("Statements concerning the cause of the injury or the identity of the person who caused the injury usually are not relevant to treatment and, therefore, are not admissible under the medical diagnosis and treatment exception to the hearsay rule. . . . However, [i]n cases of sexual abuse in the home, hearsay statements made in the course of medical treatment which reveal the identity of the abuser, are reasonably pertinent to treatment and are admissible. . . . If the sexual abuser is a member of the child victim's immediate household, it is reasonable for a physician to ascertain the identity of the abuser to prevent recurrences and to facilitate the treatment of psychological and physical injuries." [Citations omitted; internal quotation marks omitted.]).

[11] In its recitation of the facts, the Appellate Court related that, in her statement, the victim had reported to Whittaker that Lopez Casado had burned her. State v. Aponte, supra, 50 Conn. App. 117–18. At trial, however, Baraja testified that on one occasion, the victim had told him that both women had burned her, and on another occasion, she blamed only the defendant.

too." Finally, we note that the defendant had admitted to Whittaker that she had hit the victim in the eye. See footnote 6 of this opinion.

Therefore, there was ample evidence, independent of the victim's testimony, to support the defendant's convictions of the assault on her eye and the risk of injury charge that involved the burning. Finally, the other risk of injury count alleged generally that the defendant had committed certain acts likely to impair the victim's health. In its instructions to the jury, the trial court did not specify to what injury or specific acts that count related. Certainly, the eye injury, for which there was substantial evidence, properly could have been the basis of that count.[12]

The only charge for which there was not an abundance of independent evidence, however, was the assault to the victim's pancreas. Although the victim had told a number of people that the defendant had injured her generally, those assaults were not specifically linked to the pancreatic injury. According to the medical testimony, the marks on the right upper part of the victim's abdomen were consistent with that injury. Only the victim's trial testimony, however, in which she examined the photograph depicting those marks and identified the defendant as the person to have caused them, clearly implicated the defendant in that particular injury. As a consequence, applying the factors set forth in *State* v. *Santiago*, supra, 224 Conn. 333, we cannot conclude that, without the victim's trial testimony, the

---

[12] Indeed, in response to the defendant's claim in her appeal to the Appellate Court that she could not properly have been convicted of both risk of injury counts, the state's position was that the first of those counts is based on the eye injury, which occurred on March 30, 1994, the day before the victim's admission to the hospital; and that the second count of risk of injury is based on the injury to the victim's pancreas, which was of recent origin, and on beatings that were at least two weeks old and cigarette burns that were at least one week old. *State* v. *Aponte*, supra, 50 Conn. App. 132.

defendant would have been convicted of that assault. Consequently, the impropriety was not harmless beyond a reasonable doubt.

## II

In her appeal to the Appellate Court, the defendant claimed that the trial court improperly had permitted the victim to testify although her testimony, according to the defendant, was incomprehensible.[13] In rejecting the defendant's claim, the Appellate Court reasoned: "Child abuse is one of the most difficult crimes to detect and prosecute, in large part because there are often no witnesses except the victim. *State* v. *James*, 211 Conn. 555, 566, 560 A.2d 426 (1989). General Statutes § 54-86h provides in relevant part: No witness shall be automatically adjudged incompetent to testify because of age and any child who is a victim of assault . . . shall be competent to testify without prior qualification. The weight to be given the evidence and the credibility of the witness shall be for the determination of the trier of fact. . . . Certainly if a child assault victim could only babble or could present no useful evidence, its testimony could hardly be deemed relevant or probative. . . . Many witnesses, not only children, have difficulty in remembering events, understanding questions, and expressing themselves clearly, disabilities that often raise problems for the cross-examiner. *State* v. *James*, supra, [564-65]. . . . Inconsistencies in testimony and witness credibility are matters that are within the exclusive purview of the jury to resolve at trial. *State* v. *Smith*, 46 Conn. App. 600, 608, 700 A.2d 91, cert. denied, 243 Conn. 935, 702 A.2d 642 (1997)." (Citations omitted; internal quotation marks omitted.) *State* v. *Aponte*, supra, 50 Conn. App. 123–24. We agree with

---

[13] The defendant also argued to the Appellate Court, as well as to this court, that the nonverbal nature of the victim's testimony deprived the defendant of her right to meaningful cross-examination in violation of the state and federal confrontation clauses.

the Appellate Court that the trial court properly left the issue of the victim's credibility to the jury.

In *State* v. *James*, supra, 211 Conn. 559–60, the court addressed the defendant's claim that § 54-86h violated his rights of due process and of confrontation. In rejecting his assertions, this court recognized the modern trend toward the treatment of competency as simply one aspect of the credibility of a witness. Id., 563. We further acknowledged the then current child development research indicating that " 'even very young children can be credible eyewitnesses, particularly when combined with the other findings that children are as capable as adults of answering direct objective questions and are no more easily swayed into incorrect answers by leading questions.' " Id., quoting B. Marin, D. Holmes, M. Guth & P. Korvac, "The Potential of Children as Eyewitnesses: A Comparison of Children and Adults in Eyewitness Tasks," 3 Law & Hum. Behav. 295, 304 (1979).

Thereafter, in *State* v. *Weinberg*, 215 Conn. 231, 242, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990), this court stated that "[i]n determining the competency of a proposed witness the trial court should consider the capacity of the witness to receive correct sense impressions, to comprehend the facts to be developed, to recollect and narrate facts intelligently, and to appreciate the moral duty to tell the truth." (Internal quotation marks omitted.)

The court then looked to the federal courts for guidance in how to measure the "capacity" required for a determination of competency. Relying on rule 601 of the Federal Rules of Evidence, we concluded that a trial court "maintains the obligation to ensure that a witness' testimony meets the minimum standard of credibility necessary to permit a reasonable person to put any credence in that testimony. . . . In making

this determination the court will still be deciding competency. It would, however . . . be more accurate to say that the court will decide . . . minimum credibility. This requirement of minimum credibility is just one aspect of the requirement of minimum probative force—i.e., relevancy. Regardless of terminology, the trial judge may exclude all or a part of the witness' testimony on the ground that no one could reasonably believe the witness could have observed, remembered, communicated or told the truth with respect to the event in question." (Internal quotation marks omitted.) Id., 243. Finally, we concluded that rule 601, as applied by the federal courts, establishes a reasoned approach to determining the admissibility of a witness' testimony and adopted the rule that "where the competency of a witness is challenged, the threshold question to be answered by the court is whether the testimony of that witness is minimally credible. If the testimony of a witness passes the test of minimum credibility, and is otherwise relevant, the testimony is admissible and the weight to be accorded it, in light of the witness' incapacity, is a question for the trier of fact. . . . [T]he competency of a witness is a matter peculiarly within the discretion of the trial court and its ruling will be disturbed only in a clear case of abuse or of some error in law." (Internal quotation marks omitted.) Id., 243–44.

With this rule as our framework, we conclude that the trial court did not abuse its discretion in finding the victim competent to testify at trial. On appeal, the defendant focuses essentially on the lack of a narrative by the victim. Her attack on the linguistic nature of the testimony can be distilled, in essence, to a complaint that the victim responded to a series of leading questions. The fact that the victim's answers were in the affirmative or in the negative does not negate her ability to relate or communicate. The jury heard both the question and the answer, and therefore was able to determine, in light of the form of the question, whether the

question suggested the answer or, instead, whether the answer was given independent of any possible suggestion inherent in the question. The defendant also points out that the victim often failed to provide verbal responses to questions by both parties, choosing instead to nod her head, which nonverbal responses were recorded over the defendant's objections. She argues that, by failing to respond verbally, the victim did not demonstrate sufficient comprehension. We disagree that the trial court was required to conclude that the victim had not satisfied the legal standard for minimal credibility. The fact that the victim often did not respond like an adult did not transform her testimony into "babble or [demonstrate that she] could present no useful evidence . . . ." *State* v. *James*, supra, 211 Conn. 565.

In addition, the defendant points to what she deems three "failed responses" to questions because they did not supply the information requested. Specifically, the victim did not know what to call the courtroom; she repeated that she was a girl and that the prosecutor was a boy in response to a question about the need for her to tell the truth; and finally, she stated that the defendant and Lopez Casado were mother and daughter.

The state responds that the fact that the four year old victim was unfamiliar with what to call her surroundings does not indicate her lack of comprehension, but, rather, more probably, indicates her lack of familiarity with her surroundings. Additionally, the fact that she misidentified the relationship between the defendant and Lopez Casado, with whom the victim had had contact for only one month while in their care, was neither surprising nor particularly relevant. Furthermore, as the state notes, immediately preceding the question about the need to tell the truth, the state had asked the victim a series of questions that pertained to

her ability to know the difference between boys and girls. This four year old's inability to immediately "shift gears" does not demonstrate a lack of comprehension such that her testimony should have been disallowed. Finally, as the state points out, when the state repeated the question about whether the victim knew to tell the truth, she responded by nodding in the affirmative. That response, coupled with her testimony moments earlier that she would tell the truth "with God's help," reflected sufficient comprehension of the need to be truthful.

The trial court, relying on this court's opinion in *State v. James*, supra, 211 Conn. 563–65, and its own observations of the victim, concluded that she possessed sufficient ability to observe, recollect, relate and be truthful, leaving it to the jury to assess any issues relating to the victim's credibility. Under the circumstances of this case, we conclude that the trial court acted properly.

The judgment of conviction of one count of assault in the first degree and two counts of risk of injury is affirmed; the judgment of conviction of the second count of assault in the first degree is reversed and the case is remanded to the Appellate Court with direction to remand the case to the trial court for a new trial on that count.

In this opinion CALLAHAN, C. J., and NORCOTT, J., concurred.

PALMER, J., concurring. I agree with the result and much of the reasoning of the majority opinion. I write separately, however, because I disagree with the majority's characterization of the impropriety in this case.

Although the majority acknowledges the trial court's finding that the prosecutor's actions were not inspired by any improper motive, it nevertheless emphasizes the "obvious" nature of the prosecutor's misconduct. By

characterizing the prosecutor's actions as obvious misconduct, I believe the majority unjustifiably maligns both the trial court and the prosecutor.

Not every benefit or courtesy bestowed upon a witness by the state constitutes misconduct. Indeed, prosecutors routinely bargain with persons charged with crimes to obtain their testimony. The state is entitled to facilitate the testimony of a witness so long as the prosecutor does not seek to influence the witness' testimony, and discloses any benefit provided to the witness so that the defendant may explore the witness' interest and possible bias on cross-examination.

In this case, the trial court had asked the prosecutor to make the child more comfortable. The prosecutor sought to do so by giving her a doll that she brought with her to court. The trial court expressly found that the prosecutor, who never sought to conceal his actions, was attempting to put the victim at ease, rather than seeking to influence her testimony, when he gave her the doll. Moreover, the defendant, on cross-examination, elicited testimony from the victim that the prosecutor had given her the doll after inquiring whether she "lik[ed] Barney." Thus, the jurors, who witnessed the victim holding the doll throughout her trial testimony, were well aware of the fact that she had received the doll from the prosecutor. Finally, the trial court, who had the opportunity to observe the victim closely while presiding over her direct examination, also expressed his emphatic belief that the prosecutor, by "bringing [the victim] into the court and giving her a toy," could not have influenced her testimony.

Nevertheless, with the benefit of 20-20 hindsight not available to the trial court or the prosecutor, I am constrained to conclude, for the following reasons, that the prosecutor's conduct, although not improperly motivated, tainted the proceedings. First, the victim's

extremely young age and obvious vulnerability gave rise to a real risk that, as a result of her receipt of the doll, she would view the prosecutor in a favorable light and, consequently, seek to please him with her answers. Second, it may be presumed that the victim was especially susceptible to such influence, albeit unintended, in view of the frightful treatment that she had received at home. Finally, given the victim's tender age and emotional fragility, her ability to respond to questions was extremely limited, and, as a result, meaningful cross-examination into her possible bias in favor of the prosecutor was virtually impossible.

For the reasons set forth by the majority, however, I also agree that the conduct was harmful only with respect to the second count of the defendant's assault convictions. I, therefore, conclude that the defendant's other three convictions must be sustained.

Accordingly, I concur in the result.

MCDONALD, J., concurring. I agree with the majority's conclusion that the defendant's conviction on the second count of assault in the first degree must be reversed. I do not subscribe, however, to that part of the majority opinion finding prejudicial misconduct by the state's attorney.

It is important and sensible that, when young witnesses—here only four years old—testify in cases of abuse such as this one, the courts make special accommodations for their tender age. The stresses that young children undergo when testifying in cases of abuse are well documented. "Psychiatrists have identified components of the legal proceedings that are capable of putting a child victim under prolonged mental stress and endangering his emotional equilibrium: repeated interrogations and cross-examination; facing the accused again; the official atmosphere in court; the acquittal of the accused for want of corroborating evidence to the

child's trustworthy testimony; and the conviction of a molester who is the child's parent or relative." (Internal quotation marks omitted.) K. Maye & S. Meiring, "The Child Witness in Abuse Prosecutions," 56 Okla. B.J. 2946, 2946 (1985); see also L. Brannon, "The Trauma of Testifying in Court for Child Victims of Sexual Assault v. The Accused's Right to Confrontation," 18 L. & Psychol. Rev. 439, 442 (1994) (child witnesses undergo fear and trauma when testifying in presence of accused). Child witnesses must be made to feel comfortable in the unfamiliar and intimidating surroundings of a courtroom. "In cases such as this, where it is necessary to receive testimony from young children, the court must strike a balance between the defendant's right to a fair trial and the witness's need for an environment in which he or she will not be intimidated into silence or to tears." *State* v. *Cliff*, 116 Idaho 921, 925, 782 P.2d 44 (App. 1989).

Our statutes acknowledge the need to accommodate child witnesses in the courtroom. General Statutes § 54-86g (b) provides that, when a child testifies in a child abuse case, a court may prohibit persons from entering and leaving the courtroom, require attorneys to remain seated, permit the use of anatomically correct dolls to elicit testimony, and permit an adult with whom the child is familiar to sit in close proximity to the child during testimony. The statute also forbids intimidating questioning or objections. These special accommodations are permitted in order to put the child at ease.

Courts have recognized that a doll or stuffed animal may have a soothing effect on a child witness. See *State* v. *Cliff*, supra, 116 Idaho 925 (upholding trial court's decision to allow child to bring doll to stand); *State* v. *Gutkaiss*, 206 App. Div. 2d 628, 631, 614 N.Y.S.2d 599 (1994) (defendant not prejudiced by child holding teddy bear while testifying); *State* v. *Marquez*, 124 N.M. 409, 413, 951 P.2d 1070 (App. 1997), cert. denied, 124 N.M.

311, 950 P.2d 284 (1998) (same); cf. *State* v. *Palabay*, 9 Haw. App. 414, 420–24, 844 P.2d 1 (1992), cert. denied, 74 Haw. 652, 849 P.2d 81 (1993) (if necessary, child may hold teddy bear while testifying). Professional studies have documented that children derive comfort from familiar stuffed animals and should be allowed to hold them while testifying. See, e.g., J. Myers, K. Saywitz & G. Goodman, "Psychological Research on Children as Witnesses: Practical Implications for Forensic Interviews and Courtroom Testimony," 28 Pac. L.J. 3, 71 (1996).

When the child initially took the stand at trial, she was accompanied by the victim's advocate of the office of the state's attorney, who had a bag of toys. Defense counsel complained that the victim's advocate "look[ed] like Santa Claus there."[1] Defense counsel objected to the bag of toys being placed at the child's feet, but did not object to the Barney doll the witness was holding. The trial court refused defense counsel's request to remove the bag of toys, stating that it was "not going to disturb the . . . arrangements . . . that have been made to allow a minor child of these tender years to testify in a court of law. I'll exercise my discretion and allow it. I do not see any harm to anyone, the defendant . . . the state or anyone else. And I certainly don't see how it will affect the witness' testimony other than, perhaps, to aid her . . . to be calm and to have something to hold onto that she's more accustomed to rather than a large courtroom such as this." The next day of trial, defense counsel asked the child who had given her the Barney doll that she again was holding as she testified.

---

[1] Also known as St. Nicholas, Santa Claus carries a bundle of toys as gifts to children. See generally C. Moore, The Night Before Christmas (Holiday House 1980 Ed.).

Before trial, the trial court had invited suggestions from counsel regarding the procedures to be used during the child's testimony and ruled that persons could not leave and enter the courtroom during the child's testimony, and that counsel must remain seated during questioning and use language and mannerisms that are not intimidating to the child. The parties agreed that, in order to comfort the child, her grandmother would be seated next to her throughout her testimony. However, when the state's attorney suggested, three or four weeks before trial, that both parties jointly provide the child with a doll, defense counsel rejected the proposal. The state's attorney, after being rebuffed by defense counsel, presented a doll to the child that she could take with her into the courtroom whenever she was going to testify, and it was obvious that, when the child had taken the stand, the state was supplying her with a variety of toys. I hardly think this calls for a finding of prosecutorial misconduct by the state's attorney. As the trial court recognized, "the conduct of the state's attorney in making the child comfortable was strictly for that purpose."

As Justice Palmer points out in his concurring opinion, attorneys often, and properly, call witnesses that are given consideration for their testimony: expert witnesses, informers, accomplices and coconspirators, among others. The well established rule is that the effect of such consideration on the testimony of any individual witness may be assessed by the trier. See, e.g., 3A J. Wigmore, Evidence (4th Ed. 1970) § 940, p. 775 (partiality of witness is relevant to weight of testimony). This rule mitigates against the conclusion that the act of giving a child a doll to hold in court requires a new trial. Under Connecticut's new witness protection law,[2]

---

[2] Public Acts 1999, No. 99-240, § 6, provides that, in the prosecution of a serious felony offense, any "witness at risk of harm" may receive protective services, including armed protection, escort, marked or unmarked surveillance, temporary physical relocation and basic living expenses.

where the child may owe her very life to the state's protection, a similar argument may be made. We should not establish a different rule for a young child, a difficult witness and the victim of frightful treatment. Unfortunately, the rule the majority adopts today especially and negatively affects the prosecution of child abuse cases.

As to the possibility that the child may have been influenced by the conduct of the state's attorney, I agree that this issue should be the subject of cross-examination before the jury. See, e.g., *Davis* v. *Alaska*, 415 U.S. 308, 316–17, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974) (one function of cross-examination is to expose witness' bias or motivation for testifying). The trial court unduly restricted the defendant's cross-examination on this matter and I agree that that restriction warrants a reversal of the defendant's conviction for the assault that resulted in the child's internal pancreatic injury.

Accordingly, I concur.