## STATE OF CONNECTICUT *v.* DARYL VALENTINE
## (SC 16074)

McDonald, C. J., and Borden, Palmer, Sullivan and Vertefeuille, Js.

Argued June 1—officially released December 19, 2000

*G. Douglas Nash*, public defender, for the appellant (defendant).

*Denise B. Smoker*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *James G. Clark*, senior assistant state's attorney, for the appellee (state).

VERTEFEUILLE, J. The defendant, Daryl Valentine, appeals from a judgment of conviction of two counts of murder in violation of General Statutes § 53a-54a (a),[1] one count of attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2)[2] and 53a-59 (a) (1),[3] and one count of carrying a pistol without a permit in violation of General Statutes § 29-35 (a).[4] On appeal, the defendant claims that the trial court improperly: (1) prevented the defendant from effectively cross-examining a police detective about his conduct during the questioning of a witness in an unrelated civil case; and (2) precluded an investigator from testifying on behalf of the defendant regarding a state witness' prior inconsistent statements. We conclude that the trial court did not abuse its discretion with regard to either claim, and we therefore affirm the judgment of the trial court.

This case comes before us for a second time. In 1994, a jury tried and convicted the defendant of the four

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[2] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[3] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

[4] General Statutes § 29-35 (a) provides in relevant part: "No person shall carry any pistol or revolver upon his person . . . without a permit to carry the same issued as provided in section 29-28. . . ." Section 29-35 was amended by No. 99-212, § 2, of the 1999 Public Acts and No. 00-99, § 77, of the 2000 Public Acts. The changes therein, however, are technical in nature and are not relevant to this appeal. For purposes of clarity, references herein are to the 1999 revision of the statutes.

charges. On appeal, the defendant challenged several of the trial court's evidentiary rulings and the court's denial of his motion to dismiss. *State* v. *Valentine*, 240 Conn. 395, 398, 692 A.2d 727 (1997). We agreed with the defendant that the trial court committed harmful error in excluding extrinsic evidence that the defendant had offered to impeach a witness' identification of the defendant as the shooter. Id., 402–403. We reversed the judgment of the trial court and ordered a new trial. Id., 419.

In 1998, after a second trial, a jury again found the defendant guilty of the same four charges. This appeal followed. We now affirm the trial court's judgment.

The jury reasonably could have found the following facts. On September 21, 1991, shortly before 3 a.m., Andrew Paisley, Hury Poole, and Christopher Roach arrived at the Athenian Diner, located on Whalley Avenue in New Haven. The diner was very busy, and a large crowd of people was waiting outside. As the three men approached the front of the diner, they saw people fighting on the steps of the diner. Bryon McFadden, a witness for the state, heard an individual whom he identified as Tyrone Adams say: "Shoot him, shoot him, [expletive] it, shoot him." Shortly afterward, the defendant came around from the side of the diner and fired several gunshots that hit and fatally wounded both Paisley and Poole. The defendant then ran to a parked car and got into the front passenger seat. Roach chased after him and approached the driver's side of the car. The defendant shot Roach twice in the forearm through the open driver's side window and the car sped away.

I

The defendant first claims that the trial court improperly precluded the defense from effectively cross-examining Detective Joseph Greene of the New Haven police department about having coerced a witness. Specifi-

cally, the defendant claims that Greene's questioning of a witness in an unrelated civil case bore on his bias and veracity regarding the questioning of two witnesses in the defendant's case. The defendant claims that the trial court's ruling violated both his federal and state constitutional right to confrontation and his common-law right to cross-examination.

The jury reasonably could have found the following additional facts, which are relevant to this issue. On September 21, 1991, Tara Brock, Regina Coleman, and Kristina Higgins were sitting in a parked car in the Athenian Diner parking lot when they witnessed the shooting. That same day, Greene, the lead detective in the shooting, spoke to Coleman at her home based on a tip that she may have been present during the shooting. Coleman told Greene that she was at a party at the time of the shooting and did not know what had happened. On September 26, 1991, Higgins provided the police with a tape-recorded statement in which she identified the defendant as the shooter. She also identified the defendant in a photographic array. On September 28, 1991, Greene brought Coleman to the police station for questioning. At the station, Coleman also gave the police a tape-recorded statement in which she identified the defendant as the shooter. She also positively identified the defendant from a photographic array. On October 1, 1991, Higgins signed a typewritten version of her recorded statement. On October 10, 1991, however, Coleman refused to sign a typewritten version of the recorded statement that she had given to the police.

At the defendant's first trial, both Higgins and Coleman recanted their statements. Higgins testified that she and her two companions were not present during the shooting and that she had lied in her tape-recorded statement. Further, she testified that Greene had threatened her with jail time to elicit the recorded statement, and then afterward had bought her some alcohol and

cigarettes and had given her $50 to buy cocaine. The trial court admitted her signed statement for substantive purposes under *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 474 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).[5] Coleman similarly testified that her statement had been fabricated due to Greene's influence. She testified that she had told Greene that she was not present at the diner during the shooting and had arrived only afterward, but that Greene had continued to interrogate her and had pressured and bribed her to elicit the statement.

During the defendant's second trial, Higgins maintained that Greene had coerced her to fabricate her tape-recorded statement. The trial court again admitted her statement for substantive purposes under *Whelan* and also admitted her prior trial testimony for impeachment purposes. Coleman testified that she did not remember the shooting or giving a recorded statement. She also testified that she did not recall testifying in the first trial against the defendant. She did, however, acknowledge that she had identified the defendant in a photographic array. The state introduced her statement as a prior inconsistent statement for impeachment purposes. Coleman testified that she did not remember saying that the tape-recorded statement was untrue nor did she remember whether Greene had told her what to say or had pressured her in any way. She also testified that Greene had not offered her any money, although she wished that he had. The trial court admitted her prior testimony for substantive purposes under *Whelan*.

Subsequently, the defendant sought to introduce evidence concerning a judgment against Greene in an unre-

---

[5] *State* v. *Whelan*, supra, 200 Conn. 753, allows for the substantive use of a prior written inconsistent statement if: "(1) the statement is in writing; (2) it is signed by the declarant; (3) the declarant has personal knowledge of the facts set forth in the statement; and (4) the declarant testifies at trial and is subject to cross-examination." *State* v. *Hopkins*, 222 Conn. 117, 123, 609 A.2d 236 (1992).

lated civil case to impeach his testimony on cross-examination. See *Ham* v. *Greene,* 248 Conn. 508, 729 A.2d 740, cert. denied, 528 U.S. 929, 120 S. Ct. 326, 145 L. Ed. 2d 254 (1999). In that case, the plaintiff, who had been falsely accused of murder and held in custody for approximately three months, sought damages from Greene and another detective for, inter alia, false arrest, malicious prosecution and violation of his civil rights. Id., 509. Part of the plaintiff's claim in that case was that Greene had coerced a witness into making an inculpatory statement against the plaintiff, which Greene had then included in a warrant affidavit.[6] Id., 516 n.4. The jury found in favor of the plaintiff. Id., 518.

In the present case, the state filed a motion in limine in the trial court to preclude the defendant from questioning Greene about *Ham.* In response, the defendant argued that the trial court's finding in *Ham* bore on Greene's veracity and thus on the reliability of the tape-recorded statements made by Coleman and Higgins.

The defendant further claimed that, because a judgment had been rendered against Greene in *Ham,* where the facts of the case involved Greene coercing witnesses to make incriminating statements, that judgment should be admissible for impeachment purposes against Greene in the present criminal action, where the defendant similarly claimed that Greene coerced witnesses.

---

[6] In *Ham,* Greene had questioned a witness, Joseph Timothy Davis, who later recanted his statement that had implicated the plaintiff in a murder. "At trial, Davis described how he had been taken to the New Haven police station where Greene intimidated and threatened him with prosecution. Davis related how Greene had told him falsely that the plaintiff had incriminated him in the shooting. Davis further testified that Greene, in effect, had told him what to say in his tape-recorded statement. Davis testified that in order to ensure his release, Davis had fabricated a story incriminating the plaintiff, which was included in the warrant affidavit. Davis further explained to the jury that . . . he recanted his statement incriminating the plaintiff. There was also evidence that the defendants were aware of the recantation." *Ham* v. *Greene,* supra, 248 Conn. 516–17 n.4.

The defendant claimed that *Ham* was relevant to establish Greene's pattern of conduct or method of eliciting statements from reluctant witnesses.

In an effort to accommodate the court in ruling on the state's motion in limine, the defense proposed six questions that it would ask Greene and deferred to the court regarding the propriety of modifying the questions.[7] The trial court, however, excluded all evidence regarding the judgment in *Ham*. The court determined that the judgment was irrelevant and concluded that: (1) most of the questions the defendant sought to ask did not pertain to Greene's veracity as a witness; (2) the judgment might confuse the jury; (3) the issues that the defendant wanted to raise, in light of Coleman's testimony in the present case and at the first trial, were collateral; (4) the court would be required to give more extensive instructions that might further confuse the jury; and (5) the parties essentially would have to retry the *Ham* case in order to establish what evidence the parties had presented and what evidence the jury may have relied on.

The defendant maintains that the trial court's decision to exclude evidence concerning the judgment in

---

[7] The defendant proposed to ask Greene the following six questions regarding *Ham*:

"1. On May 8, 1997, was a civil judgment entered against you on one count for violating [the] constitutional rights of Eric Ham by false and unreasonable arrest?

"2. On May 8, 1997, was a civil judgment entered against you on a second count for violating the constitutional rights of Eric Ham by malicious prosecution?

"3. On May 8, 1997, was a civil judgment entered against you on a third count for malicious prosecution?

"4. On May 8, 1997, was a civil judgment entered against you on a fourth count for intentional infliction of emotional distress?

"5. Were the underlying claims of this judgment involving an incident in February of 1991, where individuals claimed [a] coerced false statement in a murder case which was ultimately dismissed by the state's attorney office?

"6. Were the underlying claims additionally asserting the suppression of favorable evidence to the accused?"

*Ham* prevented him from exposing to the jury evidence that Greene harbored a bias against reluctant witnesses. The defendant claimed that the court's decision resulted in a denial of his constitutional rights to confrontation and to present a defense under the sixth[8] and fourteenth[9] amendments to the United States constitution, his right to confrontation under article first, § 8, of the constitution of Connecticut,[10] and his common-law right to cross-examination.[11] We disagree.

A trial court's ruling on the admissibility of evidence is afforded great deference. See *State* v. *Castonguay*, 218 Conn. 486, 497, 590 A.2d 901 (1991). "The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." *State* v. *Aponte*, 249 Conn. 735, 750, 738 A.2d 117 (1999). Furthermore, "[t]o establish an abuse of discretion, [the defendant] must show that the restrictions imposed upon [the] cross-examination were clearly prejudicial." (Internal quotation marks omitted.) *State* v. *Bova*, 240 Conn. 210, 219–20, 690 A.2d 1370 (1997). "The proffering party

[8] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

[9] The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[10] Article first, § 8, of the Connecticut constitution provides in relevant part: "In all criminal prosecutions, the accused shall have a right . . . to be confronted by the witnesses against him . . . ."

[11] The defendant invoked both the federal constitution and the constitution of Connecticut. However, "he has proffered no argument that the rights afforded to him by the federal and the state constitutions are in any way distinguishable with respect to the substantive issue that he has raised. We see no reason, on the facts of this case, independently to undertake such an analysis." (Internal quotation marks omitted.) *State* v. *Birch*, 219 Conn. 743, 746 n.4, 594 A.2d 972 (1991).

bears the burden of establishing the relevance of the offered testimony. Unless such a proper foundation is established, the evidence . . . is irrelevant." (Internal quotation marks omitted.) *State* v. *Barnes*, 232 Conn. 740, 747, 657 A.2d 611 (1995).

Although the trial court has broad discretion in determining the admissibility of evidence and the extent of cross-examination, "the preclusion of sufficient inquiry into a particular matter tending to show motive, bias and interest may result in a violation of the constitutional requirements of the sixth amendment" to the United States constitution. *State* v. *Colton*, 227 Conn. 231, 249, 630 A.2d 577 (1993), on appeal after remand, 234 Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996). The sixth amendment to the United States constitution guarantees the right of an accused in a criminal prosecution to confront and cross-examine the witnesses against him. *Chambers* v. *Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); *Pointer* v. *Texas*, 380 U.S. 400, 403–404, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965); *State* v. *Aponte*, supra, 249 Conn. 749. We have held that "[t]he primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying." (Citation omitted; internal quotation marks omitted.) *State* v. *Colton*, supra, 249. Therefore, an accused's right to cross-examination to elicit facts tending to show motive, interest, bias and prejudice may not be unduly restricted by the wide discretion of the trial court. *State* v. *Lubesky*, 195 Conn. 475, 482, 488 A.2d 1239 (1985). "In determining whether a defendant's right of cross-examination has been unduly restricted, we consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-

examination viewed in relation to the issues actually litigated at trial." (Internal quotation marks omitted.) *State* v. *Bova,* supra, 240 Conn. 219. "In order to comport with the constitutional standards embodied in the confrontation clause, the trial court must allow a defendant to expose to the jury facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." (Internal quotation marks omitted.) *State* v. *Beliveau,* 237 Conn. 576, 585, 678 A.2d 924 (1996).

We have emphasized in numerous decisions, however, that the confrontation clause does not give the defendant the right to engage in unrestricted cross-examination. See *State* v. *Aponte,* supra, 249 Conn. 750; *State* v. *Bova,* supra, 240 Conn. 219; *State* v. *Kelley,* 229 Conn. 557, 562, 643 A.2d 854 (1994). A defendant may elicit only relevant evidence through cross-examination. See *State* v. *Aponte,* supra, 750; *State* v. *Bova,* supra, 219; *State* v. *Kelley,* supra, 562. "The court determines whether the evidence sought on cross-examination is relevant by determining whether that evidence renders the existence of [other facts] either certain or more probable." (Internal quotation marks omitted.) *State* v. *Kelley,* supra, 562.

In addition, we must emphasize that the right to cross-examine a witness pertaining to specific acts of misconduct is limited in three distinct ways. *State* v. *Chance,* 236 Conn. 31, 60, 671 A.2d 323 (1996). "First, cross-examination may only extend to specific acts of misconduct other than a felony conviction if those acts bear a special significance upon the issue of veracity . . . . Second, [w]hether to permit cross-examination as to particular acts of misconduct . . . lies largely within the discretion of the trial court. . . . Third, extrinsic evidence of such acts is inadmissible." (Internal quotation marks omitted.) Id.

In light of these principles, the relevant inquiry before us is whether the trial court's ruling to exclude evidence of the judgment in *Ham* resulted in the exclusion of extrinsic evidence that so significantly bore on the motive, bias and interest of Greene that its exclusion infringed on the defendant's confrontation rights and consequently exceeded the court's wide discretion. See *State* v. *Colton*, supra, 227 Conn. 250. "It bears emphasis that any limitation on the impeachment of a key government witness is subject to the most rigorous appellate review." Id.

We cannot conclude that the trial court abused its broad discretion in deciding that *Ham* was not relevant with respect to Greene's cross-examination. *Ham* involved a fifteen count civil complaint against Greene and another police officer in which the plaintiff had alleged federal civil rights claims pursuant to 42 U.S.C. §§ 1983 and 1988 for false arrest and malicious prosecution, and common-law claims of false arrest, malicious prosecution, intentional infliction of emotional distress and negligence. The fifteen count complaint consisting of numerous allegations of police misconduct was tried to a jury, which returned a verdict in favor of the plaintiff on each claim.

The facts presented in that case were that Greene had prepared and had submitted an affidavit in support of an arrest warrant for the plaintiff that included information from two witnesses' statements that incriminated the plaintiff. *Ham* v. *Greene*, supra, 248 Conn. 515. The affidavit did not include, however, information regarding inconsistencies between the two witnesses' final statements and their prior statements, details concerning statements from other witnesses who knew the plaintiff personally and stated that they could not identify the shooter, or information about two prison inmates who claimed responsibility for the shooting. Id., 515–16. Greene and the other officer arrested the

plaintiff, but the state dismissed the charges after the witnesses, whose statements Greene had included in his affidavit, recanted their earlier statements implicating the plaintiff. Id., 516. In particular, one of the witnesses, Joseph Timothy Davis, testified at trial that Greene had coerced him to make the incriminating statement against the plaintiff. Id., 516 n.4.

As the trial court in the present case concluded, admitting evidence of the *Ham* judgment would have created a myriad of problems. First, that judgment does not clearly or directly reflect on Greene's veracity as a witness in the present case. In particular, the defendant's six proposed questions regarding the *Ham* judgment, as set forth in footnote 7 of this opinion, did not address the issue of Greene's veracity or bias in a manner that warranted admission of evidence concerning the judgment. Only the final two proposed questions addressed the underlying claims presented in *Ham*, but those questions did not, unambiguously, address the primary issue of Greene's veracity or bias. Further, in light of the various acts of misconduct alleged in *Ham*, it cannot be determined whether the jury's decision rested upon all, some or just one of the alleged acts of misconduct. The defendant asserts the relevancy of the *Ham* judgment essentially on the basis of the testimony in that case of Davis that Greene had coerced him to fabricate an incriminating statement. That testimony, however, supported only one of many allegations against Greene and it cannot be determined whether the jury accepted the testimony as credible in rendering a verdict for the plaintiff. We agree, therefore, with the trial court's conclusion that the *Ham* judgment does not prove that Greene harbored a bias toward reluctant witnesses.

Second, as the trial court concluded, the *Ham* judgment, in light of the testimony of Higgins and Coleman during the first and second trial here regarding how

Greene allegedly coerced the taped-recorded statements, is collateral and does not link Greene's acts in *Ham* to those alleged in the present case. Moreover, the parties might have been required to introduce many of the facts from *Ham* to the jury here in order for the jurors to understand the claims presented in *Ham*. In effect, as the trial court articulated, a retrial of the facts of *Ham* may have resulted, with the very real possibility of confusing the jury. To counter this effect, the trial court noted that it would have had to have given the jury extensive instructions, which might, in turn, have caused additional confusion. The determination of whether a specific act is collateral or even relevant rests within the sound discretion of the trial court. *State* v. *Chance*, supra, 236 Conn. 60; *State* v. *Colton*, supra, 227 Conn. 248. We conclude, therefore, that the trial court did not abuse its discretion in excluding evidence of the judgment in *Ham*.

## II

The defendant next claims that the trial court improperly precluded him from impeaching the testimony of a state's witness. In particular, the defendant maintains that the trial court violated his right to present a defense by preventing him from proffering the testimony of Carmen DelValle, an investigator who worked for defense counsel, regarding a prior inconsistent statement purportedly made by a key witness, Rona London, during a telephone conversation. We disagree.

The following facts and procedural history are relevant to this claim. London testified that on the night of September 21, 1991, she visited Newt's Lounge on Whalley Avenue in New Haven and left the club at closing time, approximately one hour before the shootings.[12] London testified that she saw the defendant, whom she recognized, in the company of Adams. She

---

[12] London did not testify during the defendant's first trial.

witnessed the defendant wearing a dark colored, pull-over sweatshirt. London's description of the defendant's clothing coincided with the description of the shooter by another witness, McFadden, who had testified that the shooter, whom he could not identify, was wearing a burgundy hooded shirt.

On cross-examination, London testified that she did not recall telling anyone that she could not remember what the defendant was wearing the night of the shooting. When asked to confirm whether her address at the time of the shooting was the same as the one known to the defense, London denied living at that address. She did confirm, however, that her telephone number at the time of the shooting was the same number the defense questioned her about.

The defense sought to admit the testimony of DelValle through an offer of proof to the trial court outside the presence of the jury. DelValle testified that she initially had spoken with Elsie London, Rona London's cousin, about whether Elsie London was at Newt's Lounge the night of the shooting. DelValle testified that Elsie London denied visiting Newt's Lounge that night, but remembered that Rona London had been there. DelValle testified that she asked Elsie London to have Rona London call her and that later that same day, DelValle received a telephone call from a person identifying herself as Rona London. The caller verified her identity by giving DelValle what the caller purported to be Rona London's telephone number and street address. Del-Valle testified that she asked the caller what the defendant was wearing that night and that the caller responded that she could not remember.

DelValle also testified that she had never met Rona London and therefore did not know what she looked like nor could she recognize her voice. Also, DelValle did not know whether Elsie London actually had given

Rona London the message to call DelValle. Moreover, DelValle testified that she never verified whether the telephone number and street address that the caller gave actually belonged to Rona London. The telephone number DelValle wrote down after her conversation with the caller was, however, the same number Rona London had testified was hers at the time of the shooting.

The state objected to DelValle's testimony on the grounds that the defendant had failed to establish a sufficient foundation and that the defendant did not authenticate that the caller was Rona London. The trial court sustained the objection, concluding that, in light of DelValle's testimony that she did not corroborate the information or the statements the caller gave to her, and that she could not identify the caller's voice, the defendant did not sufficiently authenticate the caller's identity. The court further noted that the caller could have been Elsie London or anyone to whom she had spoken regarding her conversation with DelValle and who knew Rona London's telephone number and street address. The trial court, therefore, excluded DelValle's testimony as unreliable.

"A statement is admissible as a prior inconsistent statement . . . only when the trial court is persuaded that, taking the testimony of the witness as a whole, the statements are in fact inconsistent. . . . Such a determination as to inconsistency lies within the discretionary authority of the trial court." (Citations omitted.) *State* v. *Avis*, 209 Conn. 290, 302, 551 A.2d 26 (1988), cert. denied, 489 U.S. 1097, 109 S. Ct. 1570, 103 L. Ed. 2d 937 (1989). As set forth in part I of this opinion, the trial court's ruling on the admissibility of evidence is entitled to great deference and will be overturned "only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice."

(Internal quotation marks omitted.) *State* v. *Hines*, 243 Conn. 796, 801, 709 A.2d 522 (1998).

Similar to writings, authentication is a necessary preliminary to the introduction of telephone communications. See *State* v. *Berger*, 249 Conn. 218, 233–34, 733 A.2d 156 (1999). There need only be a prima facie showing of the telephone conversation to the court and then, as long as it is otherwise admissible, the evidence goes to the jury, which will ultimately determine its authenticity. Id., 233. The proffering party must demonstrate to the trial court that there is substantial evidence from which the jury could infer that the telephone communication was authentic. Id. Telephone conversations "may be authenticated by circumstantial evidence, if the party calling, in addition to stating his identity, relates facts and circumstances that, taken with other established facts, tend to reveal his identity." Id., 233–34; see also 2 C. McCormick, Evidence (5th Ed. 1999) § 226, p. 52. The fact that the voice of the caller was not identified, however, does not render the conversation inadmissible. *International Brotherhood of Electrical Workers Local 35* v. *Commission on Civil Rights*, 140 Conn. 537, 546, 102 A.2d 366 (1953). A sufficient foundation must be laid, by presenting evidence regarding the subject matter of the conversation, its occurrence, and the prior and subsequent conduct of the parties, to establish fairly the identity of the caller. Id., 547. "Modern technology makes commonplace the receipt of oral communications from persons who are heard but not seen. The problems of authentication raised by these communications are substantially analogous to the problems of authenticating writings. Thus, if the witness has received, e.g., a telephone call out of the blue from one who identified himself as 'X,' this is not sufficient authentication of the call as in fact coming from X. The requisite additional proof may take the form of testimony by the witness that he is familiar with X's

voice and that the caller was X. Or authentication may be accomplished by circumstantial evidence pointing to X's identity as the caller, such as if the communication received reveals that the speaker had knowledge of facts that only X would be likely to know." 2 C. McCormick, supra, p. 52.

In the present case, although the telephone call was not "out of the blue," DelValle testified that she was not familiar with Rona London's voice and that she could not confirm that the caller was in fact Rona London. DelValle conceded that she failed to substantiate whether the information given by the caller was accurate and in fact connected to Rona London. Further, as the trial court noted, the caller did not reveal information that only Rona London would likely have known. Moreover, DelValle did not ask Rona London directly to call her and could not ensure that Rona London had received her message. As the trial court stated, the caller could also have been Elsie London or anyone who knew of her prior discussion with DelValle. We conclude that the trial court did not abuse its discretion in precluding DelValle's testimony.

The judgment is affirmed.

In this opinion the other justices concurred.

