STATE OF CONNECTICUT *v.* WILLIAM C.[1]
(AC 26877)

Schaller, DiPentima and McLachlan, Js.

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Argued June 4—officially released September 4, 2007

*Sheila A. Huddleston*, special public defender, with whom was *Moira L. Buckley*, special public defender, for the appellant (defendant).

*John A. East III*, senior assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Cynthia S. Serafini*, senior assistant state's attorney, for the appellee (state).

*Opinion*

McLACHLAN, J. The defendant, William C., appeals from the judgments of conviction, rendered after a jury trial, of sexual assault in a spousal relationship in violation of General Statutes § 53a-70b (b), unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a), breach of the peace in the second degree in violation of General Statutes § 53a-181, threatening in the second degree in violation of General Statutes § 53a-62 (a) (1) and larceny in the sixth degree in violation of General Statutes § 53a-125b (a).[2] On appeal, the defendant claims that (1) the trial court improperly admitted evidence of prior uncharged misconduct, (2) the court improperly admitted constancy of accusation testimony by the attorney who represented J, the victim, in her civil custody dispute with the defendant, (3) the court improperly precluded his cross-examination of Jacqueline Ortiz, the police detective who investigated J's complaint, as to bias and (4) the state's failure to conduct an adequate investigation constituted prosecutorial impropriety that deprived him of his due process

---

[2] After the close of the prosecution's case-in-chief, the court granted the defendant's oral motion for a judgment of acquittal as to the charge of criminal trespass in the first degree in violation of General Statutes § 53a-107 (a) (1).

right to a fair trial.[3] We affirm the judgments of the trial court.

The jury reasonably could have found the following facts. J was born in England and came to the United States in 1988. The defendant and J were married in October, 1994, and they have two sons. Problems developed in the marital relationship. In 1999, J took their two sons for extended visits in England without the defendant's consent. After the second trip, the defendant sought an injunction in 1999 to prevent J from taking the children out of the country without his permission. The defendant and J stipulated to a court order awarding them joint custody of the children with primary residence with the defendant.

In the summer of 2000, the defendant moved from their residence in New Britain to Newport, Rhode Island, without the children, to live with another woman. In December, 2001, while the defendant was still living in Newport, J moved to Waterbury with the children and rented a house. In August, 2002, she purchased the house and held title in her name alone. After J and the two boys moved to Waterbury, the defendant occasionally visited them on the weekends. Sometime during the summer of 2002, the defendant was asked to leave the residence in Newport. He told J that he wanted to move into her Waterbury residence, but she told him that she did not want him living with them. He indicated that he was returning anyway and began to move boxes of his belongings into her house over a period of a few weeks. J told the defendant that she

---

[3] After the parties filed their appellate briefs, our Supreme Court rendered its decision in State v. Fauci, 282 Conn. 23, 917 A.2d 978 (2007), in which it concluded that the term "prosecutorial impropriety" is more appropriate than the traditional term "prosecutorial misconduct." Id., 26 n.2. Although the parties have briefed the defendant's claim utilizing the nomenclature of prosecutorial misconduct, we use the term "prosecutorial impropriety" in our analysis of the defendant's claim.

wanted a divorce. He indicated that he would not allow a divorce and that she had to "work" on the marriage.

Sometime in August, 2002, J told the defendant that she had a boyfriend, M. The defendant became very upset and told her that she could no longer communicate with M. On Saturday, September 28, 2002, J told the defendant that she had to attend a work function that evening. She actually intended to attend a wedding in Massachusetts with M. On the way home, J's car broke down, and she telephoned the defendant to apprise him of the situation. She had the car towed to a dealership in Cheshire, close to her place of employment, and asked the defendant to meet her there. He was very angry that she was with M and said that he would not come. J called her friend, Heather, who agreed to meet her in Cheshire and drive her back to her house in Waterbury. While J and Heather were at the dealership, the defendant arrived with the children. J and the defendant argued in the dealership's parking lot for almost one hour before J left with the defendant. En route to Waterbury, the defendant informed J that he had telephoned their friend, Holly, who would meet them at the house and take the boys out for a few hours so that he and J could discuss the situation. During the week that followed, the defendant engaged in a pattern of sexual, physical and verbal abuse of J.

Consistent with this pattern, at approximately 1 a.m. on October 3, 2002, the defendant came into J's bedroom and turned on the light. He told her to perform oral sex, but she refused. He called her several degrading names and continued his demands, but she continued to refuse. He then told her that they would have anal intercourse. J refused, but the defendant turned her onto her stomach, held her down and sexually assaulted her. Later that morning when he drove her to work, he informed her that he would kill her or punish her and

take the boys if she told anyone about what had happened the night before. Nevertheless, J went to the police department, and the defendant was subsequently arrested. The charged offenses arose from this October 3, 2002 incident.

At one point during J's testimony at trial, the prosecutor requested that the jury be excused so that the prosecutor could make an offer of proof. Outside the presence of the jury, J related the series of events that occurred between Sunday, September 29, 2002, and Thursday, October 3, 2002, the date of the charged offenses. The defendant objected to any testimony regarding allegations of prior uncharged misconduct. The court ruled that it would permit the testimony and gave a limiting instruction to the jurors when they returned to the courtroom.

J's testimony was as follows. As soon as Holly took the boys away from the house on September 29, 2002, the defendant pulled down all of the shades. He forced J to strip and made her crawl on her hands and knees to a shower to wash away all traces of M. He called her vulgar names, struck her, spit at her and made her eat his saliva off the floor. The defendant destroyed some of her clothing by ripping and cutting various items with a pair of scissors. He told her that he was going to take the boys to England and that he would "make it hell" for her unless she did everything he told her to do until they left the country.

After the boys returned home and were put to bed, the abuse continued. The defendant would not let J sleep and made her dress in high heels and various lingerie outfits. He continued to spit on her face and hit her. On Monday morning, he took J with him to the courthouse and filed for sole custody of the children. Later that evening, when the boys were in bed, he continued abusing J and ordered her to perform oral sex.

If she refused, he struck her and threatened to kill her. He also insisted that she report to him in detail her sexual activities with M.

On Tuesday morning, October 1, 2002, the defendant drove J to her place of employment. He had taken her house and car keys, her driver's license and her credit card on Sunday evening and said that he would not return them until he left for England. He told her that she had to telephone him every hour on the hour so that he knew where she was at all times. He picked her up at the end of the day, and they fed the boys and put them to bed. At that point, the abuse continued. On Wednesday, October 2, 2002, the defendant again drove J to work and picked her up at the end of the day. After the children went to bed, the abuse continued. The alleged misconduct culminated in the sexual assault incident in the early morning hours of October 3, 2002, for which the defendant was charged.

After J's testimony, several witnesses testified that J had told them that the defendant had sexually assaulted her on October 3, 2002. The defendant had objected to all of J's testimony relating to allegations of his prior uncharged misconduct on the ground that it was highly prejudicial. He also objected to the testimony of attorney Kimberly Peterson, one of the constancy of accusation witnesses, again on the ground that it was highly prejudicial. The defendant did not object to the constancy of accusation testimony given by the other witnesses.

The jury found the defendant guilty of all of the crimes charged except criminal trespass in the first degree. As to that charge, the court had granted the defendant's oral motion for a judgment of acquittal at the close of the state's case-in-chief. The court accepted the verdict and sentenced the defendant to a total effective term of fifteen years incarceration, execution suspended after

eight years, with fifteen years probation. This appeal followed.

I

The defendant first claims that the court improperly admitted evidence of his prior uncharged misconduct. Specifically, the defendant claims that the court improperly allowed the victim to testify about the instances of abuse that occurred in the days leading to the charged offenses. The defendant claims that this evidence substantially affected the verdict, warranting a reversal of the conviction. We disagree.

Just prior to the commencement of trial, the state filed a notice of intent to adduce uncharged misconduct evidence, and the defendant filed a motion in limine to preclude evidence of prior uncharged misconduct. The court indicated that it would address the issue as it arose at trial. When the issue arose during the testimony of the state's first witness, J, the court excused the jury and conducted a hearing on the motions, which included the voir dire examination of J.

J testified that during the week leading to the charged offenses, the defendant forced her to engage in a series of degrading acts. J testified that from the time the defendant discovered that she had gone to the wedding with M on September 28, 2002, until his arrest nearly a week later, the defendant engaged in a pattern of verbal, physical and sexual abuse toward her, including threats of death, physical beatings, humiliation and forced sexual acts. On appeal, the defendant takes issue specifically with J's testimony that he forced J (1) to perform oral sex on him and would not allow her to go to work or sleep unless she did so, (2) to dress in lingerie, (3) to crawl around the house and (4) to eat his saliva off the floor.

Upon conclusion of the hearing on the admissibility of this testimony, the court found that the evidence of

the prior uncharged misconduct related to events that were close in time to the alleged incidents, that they involved only J, the complainant in the charged offenses, and that the acts were similar enough to show a common plan. The court further concluded that the probative value of the evidence outweighed its prejudicial effect. On the basis of these findings, the court overruled the defendant's objection and permitted the state to introduce J's testimony regarding the defendant's prior instances of abuse.

The jury was summoned back into the courtroom, and the court gave the jury a limiting instruction pertaining to J's testimony.[4] J then testified regarding the instances of abuse that transpired in the week leading to the charged offenses. During its charge to the jury at the conclusion of trial, the court also gave the jury a standard limiting instruction outlining the purposes for which it could consider evidence of prior uncharged misconduct.

Connecticut Code of Evidence § 4-5 (b) provides: "Evidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony." In addition to the recognized exceptions to the general rule precluding admissibility,

---

[4] The court instructed the jury as follows: "Ladies and gentlemen, I want to give you . . . an instruction with respect to the testimony that you are about to hear. The defendant here is on trial only for the allegations that are contained in the information as I read it to you. There are provisions in our rules of evidence that allow other testimony to come in that may relate to motive or a common plan. Again, they are not to be taken by you as any indication that the defendant in this case is inclined to have done any of the acts. Again, the defendant here is on trial as any defendant is on trial only for the matters contained in the information. With that . . . instruction, counsel, continue."

i.e., if the purpose for which the evidence is offered is to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime, prior misconduct evidence may also be used to corroborate crucial prosecution testimony. Moreover, our Supreme Court has held that "such evidence may be used to complete the story of the crime on trial by placing it in the context of nearby and nearly contemporaneous happenings. . . .

"To determine whether evidence of prior misconduct falls within an exception to the general rule prohibiting its admission, [the court has] adopted a two-pronged analysis. . . . First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence. . . .

"[An appellate court's] standard of review on such matters is well established. The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done." (Citation omitted; internal quotation marks omitted.) *State v. Vega*, 259 Conn. 374, 397–98, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002).

With respect to the relevance prong of the analysis, "[*i*]*t is well established that* [*t*]*here is a greater liberality . . . in admitting evidence of other criminal acts to show a common scheme, pattern or design in sex-related crimes. . . .* Evidence of another sex offense is admissible to show a common scheme or plan if the offense is proximate in time, similar to the offense

charged, and committed with persons similar to the prosecuting witness." (Emphasis added; internal quotation marks omitted.) *State* v. *Sawyer*, 279 Conn. 331, 349, 904 A.2d 101 (2006). Like a system of criminal activity, evidence of prior uncharged misconduct may be admitted under the common plan or scheme exception to the general rule when it is part of a course of conduct so interconnected that proof of the uncharged conduct is part and parcel of the proof of the crime charged. See *State* v. *Vega*, supra, 259 Conn. 397–98 (evidence of course of conduct—beginning with minor assault, building to carving of name on victim's chest and escalating to charged acts—properly offered to prove system of activity on part of defendant); see also C. Tait, Connecticut Evidence (3d Ed. 2001) § 4.19.9, p. 238 ("[t]o properly fit within [the common plan or scheme] exception, there must be a 'common' scheme or 'system,' i.e., all of the conduct must be part of an overall plan so interconnected that proof of the uncharged crimes is part and parcel of the proof of the crime charged").

Here, the court permitted the evidence of a pattern of the defendant's verbal, physical and sexual abuse of J, which transpired in the week leading to the charged offenses, to show a common plan or scheme on the part of the defendant. Thus, the record supports adequately the court's conclusions with respect to proximity in time and similarity to the offenses charged, and it is undisputed that the sole witness involved was J. Moreover, the charged offenses, which occurred on October 3, 2002, simply marked the culmination of the week's events that were triggered by the defendant's discovery that J was with M on September 28, 2002. During this weeklong period, the defendant established a clear course of conduct of degradation and humiliation of J, which escalated throughout the week and culminated in the charged offenses. Thus, evidence of

the uncharged misconduct was relevant to establish a nexus between what occurred on September 28, 2002, and the charged crimes that occurred several days later on October 3, 2002.[5] As such, the evidence properly was admissible as an exception to the general prohibition against prior uncharged misconduct, as it was relevant to prove a common plan or scheme on the part of the defendant.

With respect to the court's balancing test, the defendant argues that the prior uncharged misconduct evidence dominated the trial, improperly aroused the jurors' emotions by depicting him as a monster and unfairly buttressed J's credibility, which was the pivotal issue in the case. As such, the defendant argues that the court improperly determined that the probative value of the evidence outweighed its prejudicial effect. We disagree.

"[Prior misconduct] [e]vidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury. . . . The court bears the primary responsibility for conducting the balancing test to determine whether the probative value outweighs the prejudicial impact, and its conclusion will be disturbed

[5] Indeed, the defendant raised the specter at trial that J fabricated the charged offenses after he sought sole custody of their children on Monday, September 30, 2002. Without evidence of the consistent course of conduct over that week, the jury would have been deprived of crucial evidence establishing a logical connection between the September 28 events and the October 3 event.

only for a manifest abuse of discretion." (Internal quotation marks omitted.) *State* v. *Zubrowski*, 101 Conn. App. 379, 394–95, 921 A.2d 667, cert. denied, 283 Conn. 912, 928 A.2d 539 (2007).

"Proper limiting instructions often mitigate the prejudicial impact of evidence of prior misconduct." (Internal quotation marks omitted.) *State* v. *Orellana*, 89 Conn. App. 71, 89, 872 A.2d 506, cert. denied, 274 Conn. 910, 876 A.2d 1202 (2005). "Furthermore, a jury is presumed to have followed a court's limiting instructions, which serves to lessen any prejudice resulting from the admission of such evidence." *State* v. *Myers*, 101 Conn. App. 167, 194, 921 A.2d 640, cert. granted other grounds, 283 Conn. 906, 927 A.2d 919 (2007).

Here, the court conducted a voir dire examination of J and carefully considered arguments of counsel prior to rendering its decision allowing the evidence. Moreover, the court minimized the potential prejudice to the defendant of the admitted prior misconduct evidence by giving the jury, prior to J's testimony, a detailed limiting instruction as to the role the evidence was to play in its deliberations, and it repeated its admonition to the jury in its final instructions.[6] Accordingly, we conclude that the court did not abuse its discretion by admitting evidence of the defendant's prior uncharged misconduct.

## II

The defendant next claims that the court improperly admitted constancy of accusation testimony from J's civil attorney, Peterson, who represented J in her custody dispute with the defendant. The defendant argues

[6] The defendant argues that the court's limiting instruction and its general instruction on prior uncharged misconduct in the charge to the jury improperly permitted the jury to consider the evidence for other purposes such as motive, intent or to prove an element of a charged offense. The defendant did not object at trial, however, to the court's instructions, and, therefore, the unpreserved claim of instructional error is not reviewable. See Practice Book § 60-5.

that Peterson's constancy testimony was cumulative and unnecessarily prejudicial and that it substantially affected the verdict, requiring reversal of the judgment. We disagree.

"The constancy of accusation doctrine traces its roots to the fresh complaint rule . . . [t]he narrow purpose of [which] was to negate any inference that because the victim had failed to tell anyone that she had been [sexually assaulted], her later assertion of [sexual assault] could not be believed. . . . Because juries were allowed—sometimes even instructed—to draw negative inferences from the woman's failure to complain after an assault . . . the doctrine of fresh complaint evolved as a means of counterbalancing these negative inferences. Used in this way, the fresh complaint doctrine allowed the prosecutor to introduce, during the case-in-chief, evidence that the victim had complained soon after the [sexual assault]. Its use thereby forestalled the inference that the victim's silence was inconsistent with her present formal complaint of [assault]. . . . In other words, evidence admitted under this doctrine effectively served as anticipatory rebuttal, in that the doctrine often permitted the prosecutor to bolster the credibility of the victim before her credibility had first been attacked. . . . The fresh complaint doctrine thus constituted a rare exception to the common-law rule that prohibited rehabilitative evidence in the absence of an attack on the witness's credibility." (Citations omitted; internal quotation marks omitted.) State v. McKenzie-Adams, 281 Conn. 486, 539, 915 A.2d 822 (2007).

Claims concerning the admission of the details of a sexual assault victim's complaint for corroborative purposes do not carry constitutional implications and are purely evidentiary in nature. State v. Samuels, 273 Conn. 541, 558, 871 A.2d 1005 (2005). "It is a fundamental rule of appellate review of evidentiary rulings that

if [the] error is not of constitutional dimensions, an appellant has the burden of establishing that there has been an erroneous ruling which was probably harmful to him." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 272 Conn. 515, 527, 864 A.2d 847 (2004). Moreover, the "trial court has broad discretion in ruling on the admissibility . . . of [constancy of accusation] evidence. . . . [E]videntiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *State* v. *McKenzie-Adams*, supra, 281 Conn. 538–39.

At trial, over defense counsel's objection that the evidence was cumulative[7] and prejudicial, the court allowed Peterson to testify that on October 3, 2002, J told Peterson that the defendant had sexually assaulted her that morning. Peterson then testified that after J made the statement to her, Peterson brought J to the police station. In allowing this testimony, the court determined that the evidence was admissible as constancy of accusation testimony and that the prejudicial effect of the evidence did not outweigh its probative value.

On appeal, the defendant attacks the court's application of the balancing test with respect to this evidence. On the probity side of the scale, the defendant argues that the value of Peterson's testimony was minimal because there was little delay between the claimed sexual assault and J's complaint to the police, and that the delay was explained adequately by J and the other witnesses. The defendant further argues that the evidence offered little probative value because three constancy witnesses testified prior to Peterson.

---

[7] Prior to Peterson's testimony, three other witnesses had testified at trial, without objection, that J had informed them that the defendant had sexually assaulted her.

On the prejudicial side of the scale, the defendant argues that the evidence was highly prejudicial because of its cumulative effect. The defendant further claims that the jury reasonably could have inferred that Peterson, as an officer of the court, would not have facilitated J's report of rape if she doubted J's credibility. Finally, the defendant argues that the prejudicial effect was compounded because the court did not provide the jury with a specific limiting instruction on the use of constancy evidence after Peterson testified, thereby maximizing the risk that the jury would use the testimony as substantive evidence of the defendant's guilt. We are not persuaded.

Our review of the record reveals that the court did not abuse its discretion in concluding that the probative value of Peterson's testimony outweighed its prejudicial effect. Peterson testified only as to the fact and timing of J's complaint and the details necessary to associate J's complaint with the charges against the defendant. Further, her testimony related to a complaint made by J that was separate from the other constancy witnesses, the testimony of whom the defendant neither objected to at trial nor has taken issue with on appeal. See id., 542–44 (testimony of three constancy witnesses that victim provided three separate accounts of sexual assault not prejudicially cumulative); *State* v. *Parris*, 219 Conn. 283, 294, 592 A.2d 943 (1991) (constancy of accusation testimony of four witnesses not prejudicially cumulative because each witness testified with respect to "a different statement that the victim had made to a different person at a different point in time [and] therefore, the evidence covered new matter by demonstrating, as was its relevant purpose, that the victim previously had reported the incident she described on direct examination in a constant and consistent fashion"); *State* v. *Zoravali*, 34 Conn. App. 428, 441, 641 A.2d 796 (constancy of accusation testimony of seven

witnesses not prejudicially cumulative because "all of the testimony pertained to different statements made by the victim to different people at different times"), cert. denied, 230 Conn. 906, 644 A.2d 921 (1994).

With respect to how much the lack of a delay in reporting affected the probity of the evidence, we disagree with the defendant's contention that such a delay was explained adequately by J, thereby obviating the need for Peterson's testimony. Indeed, on cross-examination of J, the defense sought to capitalize on J's lack of an accurate and prompt reporting of the incident to the police. Moreover the defense used J's disclosure to Peterson during the interim period between the sexual assault and her report to the police to help establish a motive to prevaricate on the part of J.[8]

Similarly, the defendant's claim that Peterson's credibility was enhanced because she is an officer of the court is without merit. There is, in the least, an equal

---

[8] On cross-examination, J testified as follows:

"[Defense Counsel]: Did you talk to [Peterson] on October 3?

"[The Witness]: On October 3, I did.

"[Defense Counsel]: Did you tell her you were sexually assaulted?

"[The Witness]: I believe so. I'm not sure if I told her on the phone, though, or if I told her on—I believe I did on the Thursday.

"[Defense Counsel]: Did she immediately tell you to go to the police or bring you to the police?

"[The Witness]: She told me—at that point when I called her on the Thursday is when she told me she needed a retainer. I didn't have any money. Especially, I didn't have anything on me. I wasn't able to get access to my account or anything.

"[Defense Counsel]: But you told her you were sexually assaulted?

"[The Witness]: I think I did. I'm not 100 percent sure at that point when I first called her.

"[Defense Counsel]: You don't know if you did. But she asked you for money?

"[The Witness]: *I wanted her help getting a restraining order, and I told her I wanted to get a divorce,* what was going on at the house. So, she couldn't come that day. There was something going on. It was arranged that she would come and help me on the Friday." (Emphasis added.)

inference that unlike an ostensibly neutral police officer, Peterson was an interested party acting as J's advocate, which would serve to lessen her credibility in the eyes of the jury. As the defense pointed out on cross-examination of Peterson, the defendant's incarceration would bolster J's custody case, and Peterson appeared in court at the defendant's arraignment and advocated for the court to set a higher bond.

Finally, the defendant's argument that the lack of a limiting instruction expressly identifying Peterson as a constancy witness multiplied the harm caused by the evidentiary impropriety relating to her because the jury was likely to have considered her testimony for the truth of the matter asserted is without merit. First, the court did give a general instruction on the use of constancy testimony in its charge to the jury. Second, the defendant did not object to the jury instructions at trial or request the limiting instruction that he now claims the court should have given. Therefore, the unpreserved claim of instructional error with respect to Peterson is not reviewable. See *State* v. *Samuels*, supra, 273 Conn. 566–67; see also Practice Book § 60-5.

Accordingly, we conclude that the court did not abuse its discretion in concluding that the probative value of the constancy of accusation testimony of Peterson outweighed its prejudicial effect.[9]

## III

The defendant next claims that the court violated his constitutional right of confrontation under the sixth amendment to the United States constitution and article

[9] Even if we assume arguendo that the evidence was admitted improperly, we would fail to see how the defendant could meet his burden to show substantial prejudice or injustice as a result of Peterson's testimony, especially in light of the fact that J was asked on cross-examination whether she told Peterson on October 3, 2002, that she had been sexually assaulted. See footnote 8.

first, § 8, of the Connecticut constitution by "precluding [defense] counsel from cross-examining" Detective Ortiz.[10] Specifically, he argues that by preventing him from eliciting evidence of possible bias in connection with her investigation into J's complaint, the court impermissibly restricted his right of confrontation. We disagree.

During cross-examination by the defendant, Ortiz was asked whether the results of her investigation included any reports or documents other than J's statement and the arrest warrant. Ortiz responded in the negative. She was also asked whether she had observed bruises, marks or any swelling on J's face or body when J came to give her statement. Again, she responded in the negative. Ortiz admitted that she did not take any photographs of J and did not ask J to bring in the articles of clothing that she claimed the defendant had cut into pieces. Ortiz testified that she did not speak with the defendant at any time before preparing the arrest warrant. She also admitted that, even though J had mentioned a custody dispute, she did not suspect that J was fabricating the criminal incident in order to prevail in the civil proceedings.

Additionally, Ortiz indicated during cross-examination that she relied solely on J's statement in issuing the arrest warrant because J was nervous and crying. She did not request that a forensics unit be dispatched to J's house because J told her that she already had bathed and had cleaned the area. Ortiz admitted that she did not discuss with her supervisor the possibility

---

[10] The defendant states that his claim encompasses both federal and state constitutional violations. Because he has not briefed a state constitutional claim separately, we consider only a claim of a federal constitutional violation. See *State* v. *Mulero*, 91 Conn. App. 509, 514 n.3, 881 A.2d 1039 (2005), cert. denied, 277 Conn. 912, 895 A.2d 792, cert. denied, 549 U.S. 862, 127 S. Ct. 149, 166 L. Ed. 2d 108 (2006).

of requesting a forensic examination because of J's statement that there was no evidence at the house.

At that point, defense counsel inquired whether the defendant had come to see Ortiz after J had given her statement. Ortiz responded in the affirmative. When she was asked whether the defendant was carrying documents at the time he approached her, the state objected on the ground that the question was outside the scope of the direct examination. Outside of the presence of the jury, the defendant argued that he wanted to pursue the topic of how Ortiz had conducted the investigation because her conduct indicated bias in favor of J and against him. After an offer of proof was made, the court sustained the state's objection. Subsequent to the ruling, defense counsel elicited a response from Ortiz that she did not speak to the defendant when he approached her that day because he was incarcerated. She admitted that her department did not have a policy forbidding discussion with an accused after he has been arrested.

"Although the trial court has broad discretion in determining the admissibility of evidence and the extent of cross-examination, the preclusion of sufficient inquiry into a particular matter tending to show motive, bias and interest may result in a violation of the constitutional requirements of the sixth amendment to the United States constitution. . . . The sixth amendment to the United States constitution guarantees the right of an accused in a criminal prosecution to confront and cross-examine the witnesses against him. . . . [Our Supreme Court has] held that [t]he primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Therefore, an accused's right to cross-examination to elicit facts tending to show motive, interest, bias and prejudice may not be unduly restricted by the wide discretion of the trial court. . . . In

determining whether a defendant's right of cross-examination has been unduly restricted, we consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial. . . . In order to comport with the constitutional standards embodied in the confrontation clause, the trial court must allow a defendant to expose to the jury facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." (Citations omitted; internal quotation marks omitted.) *State* v. *Valentine*, 255 Conn. 61, 70–71, 762 A.2d 1278 (2000).

The confrontation clause does not give the defendant the right to engage in unrestricted cross-examination. Id., 71. The defendant had already posed several questions to Ortiz relative to the scope of her investigation into J's complaint. She had already admitted that the arrest warrant was issued solely on the basis of J's statement, that she did not question the defendant or any other witnesses, that she did not request to see the clothing that J claimed the defendant had destroyed, that she did not dispatch a forensics unit to J's home solely because of J's statement that the house had already been cleaned and that she refused to speak to the defendant when he approached her because he was incarcerated, even though the police department had no policy prohibiting her from doing so.

In light of the foregoing, we conclude that the defendant was allowed sufficient cross-examination into the areas of prejudice, bias, motive and interest so as to satisfy the requirements of the federal constitution.

IV

The defendant's final claim is that the state's failure to conduct an adequate investigation constituted prosecutorial impropriety that deprived him of his due process right to a fair trial. Specifically, the defendant

argues that Ortiz improperly refused to accept the evidence that he offered her on the day he appeared at the police department, that the prosecutor improperly refused to consider the results of a polygraph test that the defendant had taken or the results of a psychosexual examination that he had undergone and that the prosecutor improperly declined to interview the family relations officer who had conducted the custody study for the family court during the divorce proceedings. We disagree.

"[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. Put differently, [impropriety] is [impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] caused or contributed to a due process violation is a separate and distinct question . . . . As we have indicated, our determination of whether any improper conduct by the state's attorney violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that [impropriety] was objected to at trial." (Internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 361–62, 897 A.2d 569 (2006).

We first note that, except for stating the principle that a prosecutor violates a defendant's due process rights if that prosecutor presents evidence that he or she knows to be false or should know to be false, the defendant's brief is bereft of any detailed analysis or any citation to authority in support of this claim. He simply argues that the conduct he has described is evidence of prosecutorial impropriety.

The defendant's claim merits little discussion. We conclude that no impropriety occurred.[11] Nothing in the record indicates that the prosecutor proceeded in other than good faith. An arrest order was issued, and it was signed by a judge, who found probable cause. The defendant was arrested and was brought to trial. The state presented its case, and the defendant had a meaningful opportunity to cross-examine witnesses. The defendant claimed that J's testimony was not credible. He had the opportunity to attack that credibility through cross-examination, through documents indicating inconsistencies in testimony or by presenting other reliable evidence favorable to him. If the defendant wanted the jury to hear testimony of the family relations officer, he could have subpoenaed her to court. The prosecutor was neither obligated to review the results of tests taken by the defendant[12] nor required to investigate the case in the manner desired by the defendant.

The judgments are affirmed.

In this opinion the other judges concurred.

---

[11] Because we conclude that there was no impropriety, we need not reach the second prong of the inquiry, which is whether the defendant was denied a fair trial by the alleged impropriety. See *State* v. *Necaise*, 97 Conn. App. 214, 232 n.14, 904 A.2d 245, cert. denied, 280 Conn. 942, 912 A.2d 478 (2006).

[12] With respect to the polygraph test, "polygraph evidence [is] per se inadmissible in all trial court proceedings in which the rules of evidence apply, and for all trial purposes, in Connecticut courts." *State* v. *Porter*, 241 Conn. 57, 94, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998).